THE COAL CREEK MINING COMPANY *v.* J. H. HECK
*et al.*

1. CONVEYANCE. *Exception in. What it means.* An exception is the taking of something out of the thing granted which would otherwise pass by deed, and it may be said, in general terms, that it ought to be stated and described as fully and accurately as if the grantee were the grantor of the thing excepted, and the grantor in the deed made grantee by the exception.

2. SAME. *Exception and Reservation. Difference between the terms of no benefit.* Under our system of conveyances, where all instruments are treated as mere contracts, in which the intention of the parties is to be arrived at, the distinction between *exception* and *reservation* is of no importance.

3. SAME. *Deeds purporting to be interpartes.* A deed purporting to be *interpartes,* by which an estate is conveyed to the grantee, the deed being accepted by the grantee, is held to be the deed of both parties, though only signed by the grantor.

4. CONVEYANCE MUST CARRY THE ENTIRE INTEREST. The legal effect of a conveyance must be to convey all the right owned at the time of making the instrument, whether in contract or by deed of conveyance, and that whether there is or is not a warranty of title, either general or special.

5. MARRIED WOMEN. *Conveyance by. Defective acknowledgment.* A deed of a married woman, even though registered upon a defective acknowledgment, in that form would be notice to no one, she alone conveying in the deed and the husband joining for conformity, but giving no warranty.

6. SAME. *Same. Effects as against intervening purchasers.* The deed of a married woman only takes effect as against intervening purchasers when it is properly acknowledged and registered, but it can not relate by amendment so as to affect them.

7. ADVERSE POSSESSION. *Interference between titles. Bar by statute.* The possession of land so as to produce a bar under the statute must be an actual possession of some part in dispute. Where there is an interference between titles, if one of the adverse claimants is in posses-

32—VOL. 15.

sion of the land within the boundaries of the grant, but not on any part of the interlap, the statute does not begin to run. But the moment he occupies the land included in the other's grant and holds possession, either by himself or another, the statute commences to run.

### FROM KNOX.

Appeal from the Chancery Court at Knoxville. W. B. STALEY, Ch.

ANDREWS & THORNBURGH and LUCKEY & YOE for complainants.

WEBB & McCLUNG, HENDERSON & JOUROLMON, W. P. WASHBURN, W. M. BAXTER, C. J. SAWYERS and W. H. PACE, for defendants.

FREEMAN, J., delivered the opinion of the court.

The bill of complainant was filed December 7, 1881, to assert a title to land described as follows: Beginning at a large white oak, also the northeast corner of 26,086, made to H. Wiley, and which corner is eighty poles north of a stake, four poles below Bowling's Mill on Coal creek; thence north 45° west twelve hundred poles to a chestnut tree at the northerly side of a path from Ben Wheeler's to the widow Turner's; thence south four hundred and ten poles to the northerly line of a tract of land conveyed to the Coal Creek Mining and Manufacturing Company by H. H. Wiley, W. S. McEwen and Charles A. Bulkley, by deed registered in the register's office for said county of Anderson, in Book C, vol. 2, pages 10, 11 and 12; thence with the last mentioned line nearly east to a mountain oak, the northwest corner of said grant

to H. H. Wiley; thence south about 55° east with the line of said grant to the beginning, the said tract of land being part of grant No. 22,267, made by the State of Tennessee to Thomas B. Eastland.

Defendants, it is charged, claim title to the land sued for under conveyances made by H. H. Wiley, deceased, and the executors of W. S. McEwen, deceased, but they are alleged not to have had any title to said land, but that their heirs, executors, and all persons claiming under them, are estopped from claiming said land by the terms and provisions of a certain writing in the form of an agreement of compromise between said Bulkley, Wiley and McEwen, made December 25, 1871, and which is filed as an exhibit to the bill. It is claimed that this agreement provided that Bulkley should convey to complainant said grant No. 22,267, which he accordingly did, and that Wiley and McEwen, being officers of complainant at the time of the conveyance by them of said land to defendants, were bound to protect complainant's property, and so no title passed to defendants as against the company to their vendees, the respondents. The prayer is, that the claim of respondents be declared a cloud on complainant's title, and for a decree that complainant owns the fee of said land, for a writ of possession, and an account for waste, for removal of coal, cutting timber, etc., and for general relief.

The land described above is claimed to be part of grant No. 22,267, made by the State of Tennessee to Thomas Eastland, and the estoppel sought to be set up

in the bill is against any title derived from McEwen and Wiley, and all persons claiming under or through them, and is rested, as is seen, on the face of the agreement referred to.

Respondents deny the allegation of the bill that McEwen and Wiley never had any title to the land in dispute, and were not owners thereof, and claim that by an inspection of the exhibit to the bill it will be seen that it is specially stipulated that all the land lying outside of the 40,000-acre boundary therein referred to, was to belong to. McEwen and Wiley. It is then averred all the land herein sued for did lie outside of said boundary, and so remained the property of said McEwen and Wiley, and that they had held actual and adverse possession of the same for more than twenty-five years, with the exception of a small tract. It is also insisted that for a long time after March, 1872, McEwen, Wiley and Bulkley were the sole stockholders in said corporation, and practically construed the said agreement to mean as maintained by respondents, and that Bulkley had acquiesced in the claim of Wiley and McEwen until 1878 or 1879, and the now complainants, until the filing of this bill.

Without going into the details of the pleadings further, it suffices to say that respondents claim to have purchased from Wiley and McEwen, and to have regular conveyances from them or their representatives, and then with proper averments plead they are innocent purchasers, without notice of any equity whatever, and in fact that none exists as against them.

Coal Creek Mining Company *v.* Heck.

On the hearing the chancellor dismissed complainant's bill, from which there is appeal in error to this court. The Referees report adversely to the chancellor's decree, and recommend a reversal, to which defendants file various exceptions.

Objections are made that the exceptions filed are insufficient to raise the questions, but on looking at them we think they fairly open all the questions, and are in reasonable conformity to the statute, and the practice under it, as adopted by this court. The briefs furnish such references to the record as to the facts as have been uniformly accepted by this court, and the exceptions, with one exception, sufficiently point out errors of law, and raise vital questions in the case.

In order to present the first question to be decided in this case on these pleadings, it suffices to say, complainant claims to hold grant No. 22,267 by a regular chain of conveyances from the original grantee. It claims that this grant is the oldest grant, with the oldest entry, and covers the land in dispute.

Defendants claim the larger portion of the contested land under grant No. 22,273, with mesne conveyances granted to them, or what is adjudged to be equivalent to a conveyance, a reservation of "such part of the grants specified as conveyed, as lie outside of what is known as the 40,000-acre boundary" in a deed made by Charles A. Bulkley, W. S. McEwen and Henry H. Wiley, conveying the land to complainant, the coal company; this deed dated April 22, 1872.

That deed is evidently made in pursuance of the agreement of December 25, 1871, though it is not so stated on the face of it, the consideration for the large body of land then conveyed being nominal—one dollar.

It is proper to say here that the main contest in this case, or the contention involving the largest amount of land, grows out of an interlap between the lines of grant 22,267 and grant No. 22,273. Conceding complainant owns 22,267, the question is, whether the facts in this record give complainant or defendants the better title to the land held by them under 22,273 embraced within the lines of complainant's grant. By the deed of Bulkley, Wiley and McEwen, above referred to, conveying the large body of lands, consisting of six grants of 5,000 acres each, referred to by simple number of grants, and another large body of 40,000 acres each, giving its boundaries by calls and specific description, there are found two exceptions, first, of " a fifty-acre tract within said boundary purchased by said McEwen and Wiley from John Reynolds, which is not to be embraced in this deed," but " the same is hereby expressly excepted and reserved by said Mc-Ewen and Wiley, and is bounded," etc. After the description of said fifty acres follows : " and it is further understood that such part of the grants hereinbefore designated as lie outside of the 40,000-acre boundary (which had been before given definitely) are not hereby intended to be conveyed, but are expressly excepted and reserved to said McEwen and Wiley." Then follows the *habendum* clause to the company of

all the land thus described, with a covenant of special warranty, to-wit, the parties "covenant and agree for themselves, their heirs, representatives, to warrant and defend the title to the said several tracts of land against any claim to be made by themselves, or by any person claiming through or under them, but no further or otherwise." In the enumerated six grants referred to as conveyed by the above deed, is found grant No. 22,273, and the main part of the land now in contest is the part of the land embraced in the calls of said grant, lying north of the boundary of the 40,000 acres, consequently outside of it. Bulkley, at this date, is assumed to have owned 22,267, but caused it to be conveyed to the complainant by deed of date December 16, 1872, made by himself and wife afterwards, simply describing the land conveyed—this and another grant—by the number of the grants. Bulkley, in this deed, gives no covenant at all as to the title, and the wife only a special, and that a very special one, against any act of hers by which the title or "any part thereof now or at all times shall or may be impeached."

It is proper to say, that by the agreement hereinbefore mentioned (Ex. A), the parties to it, McEwen, Wiley and Bulkley, were to procure a charter of incorporation for mining and manufacturing purposes, "and when obtained they" were "to convey to said company all right, title and interest which they may have in and to said lands included in the grants and boundary above mentioned, with the exception of the fifty-acre tract bought by McEwen and Wiley from

---

---

John Reynolds, *and such portions* of said grants as may lie *outside of the boundary of the* 40,000 *acres above set forth."*

From this it is seen clearly that this conveyance referred to was made in pursuance of, and in execution of the agreement, and was intended by the parties specifically to exclude from its operation both the fifty-acre tract and the land within the deed lying outside of the 40,000-acre boundary, and to give the same to McEwen and Wiley as against the company. It is to be remarked the land thus agreed to be, and conveyed, was to make up the capital stock of the company, for which shares of stock were to be issued to the three parties on a specified basis.

With these facts before us, what is the legal result of this reservation to McEwen and Wiley of the lands outside of the 40,000-acre boundary, the line of which is undisputed? We need not notice the distinction found in the books between an exception and a reservation, as the language of this deed is both "excepted and reserved," and the full effect of both was intended as against the company.

Mr. Washburne, Vol. 2, Real Property, page 686, says: "An exception is the taking of something out of the thing granted which would otherwise pass by the deed, and, it may be said, in general terms, that it ought to be stated and described as fully and accurately as if the grantee were the grantor of the thing excepted, and the grantor in the deed made the grantee by the exception." "It must," he adds, "be a part of the thing included in the grant, and taken

in substance out of that, in which respect it differs from a reservation, which is defined to be some new right not *in esse* in substance at the making of the grant." We take it, under our system of conveyancing, treating all instruments as mere contracts, in which the intention of the parties is to be arrived at from the language used by them, in connection with the surrounding circumstances, the result would be the same in either case, and the distinction stated be of no practical importance. The land excepted and reserved in this case is well described as being the land included in the grants referred to in the deed outside of the boundary of the 40,000-acre tract. The grants referred to specifically define the lands embraced in them, and the 40,000-acre boundary renders certain where the exception is to be found.

The effect of an exception or a reservation in this view is held by all the authorities to be "that the same consequences attach to such exception as would have attached had it been a grant: Wash., vol. 2, 688. And so it was held by this court, *Crouch* v. *Shepherd*, 4 Cold., 389, that the reservation in a deed of the right to build a water lane, and the use of the water, give to the reservee an absolute right to use it." "The reservation is held to be a grant to a right out of the granted premises by force and effect of the reservation itself," and a deed purporting to be *interpartes*, by which an estate is conveyed to the grantee, if the deed is accepted by the grantee, is held to be the deed of both parties, though only signed by the grantor: *Caraway* v. *Caraway*, 7 Cold.,

245, citing 2 Zabriskie, N. J. R., 311; Coke on Lit., vol. 2, 271–2. Much more would it be so in this case, where the deed is made and signed by all the grantors, and is accepted by the coal company as the muniment of title under which it holds the land. The deed on its face purports to be an "indenture made between" McEwen, Wiley and Bulkley and the Coal Creek Mining and Manufacturing Company, and so that company is unquestionably bound by its terms. They operate, to say the least of it, as a grant by said company by way of estoppel, and no title can be asserted by it as against this grant, certainly none existed in the company, either by contract or conveyance, at the time of accepting the deed, or made afterwards in pursuance of such a contract then in existence. This would be for a party to convey by a solemn instrument or reservation, and at the same time to defeat that conveyance by virtue of a right or claim to the land held by such party at the time of the conveyance. The legal effect of his conveyance must be to convey all the right then owned, whether in contract or by deed of conveyance, and that whether there is or is not a warranty of title, either general or special.

It is, however, most earnestly argued that the conveyance above referred to conveys only the grant, or by reference to the grant, and that inasmuch as grant No. 22,267 is older than grant No. 22,273, and the two grants interfere, the conveyee only took 22,273, subject to the dominant grant, 22,267. The case would be this: A party holds by grants two

tracts of land, or by deed, for the result would be
the same.    The two tracts by their boundaries inter-
lap each other.   While thus owning both tracts he
sells the one held under the junior grant or deed to
a third party, " the following described tract of land,"
to use the language of this deed, " granted by a given
number, reference being had to said grant for a spe-
cific description of said land."   Could the vendor in
this case be heard to say, in an action of ejectment
even, much less in a court of equity, that he was
entitled to assert his older and superior title by the
other grant, and recover the land included in the
interlap between the two?   We take it the statement
of the case in this form would be its own answer.
If the other title is to be asserted, and the vendor
retain the right to it, all would feel, as a matter of
sheer justice, it should be " so warranted in the bond,"
or the subject of contract, otherwise the party has
conveyed a deceptive title, nominally and by its plain
terms extending to the boundaries of the grant re-
ferred to for description, but in fact only covering a
less boundary, and then he with one hand is to be
held to have conveyed, and with the other not, and
to be entitled to dispossess his vendee of a portion
of the land conveyed.   To make the case stronger,
you have but to suppose the older grant had covered
the entire younger grant, then the vendee on this
principle would get nothing—a result, when put in
this form, that no one would seriously ask this court
to approve.

The case of *Dyer* v. *Yeates*, 1 Cold., 137, is cited

to sustain the contention.   In that case both parties claimed title from the same source, to-wit: the grant to Thomas Loyd for fifty acres of land.   The executor of Thomas Loyd sold the land first to Yeates, and made him a deed therefor.   There was an admitted error in one of the calls of the grant, " the third corner being a white oak, and on the face of the grant the call is from that white oak south 149 poles to the beginning," which was a post oak, then dividing the tract, which was in the form of a paralellogram, into two parts by a diagonal line.   The deed to Yeates followed the erroneous call of the grant.

On the assumption that the deed only conveyed according to the palpably erroneous call, the executor sold the other part of the tract up to that line as called for, giving him a just claim.   The contest was as to which should hold the land.   The main contention before the jury, the action being trespass, was whether the executor at the time of sale proclaimed publicly that he sold only to the contested line, and not the entire tract, and the jury having found the fact that way, this was conclusive of the case.

But the court adds:  " There really never was any dispute as to the correct line.   The lines had been plainly marked at the time of the original survey, and this fact was well known to the executor at the time of the sale to Yeates.   The error in the grant was not material, though its calls literally pursued did not take all the land conveyed by the entry, and appropriated by the survey and marking of the lines,

Coal Creek Mining Company *v.* Heck.

because on the facts stated, as a matter of law, " it did convey all the land, and vest the grantor with a legal title to the same as fully as if the calls had exactly conformed to the entry and survey—the law corrected the erroneous call, and supplied the proper calls without any correction in point of fact. We cannot see how this case, on its facts, can have any bearing on the proposition sought to be maintained here. It is simply that a party as against his vendor, or one claiming by subsequent deed under him, shall get all the land properly included within the calls of his deed. In this case there is no mistake or denial that the calls of grant No. 22,273 include the land in dispute, but it is insisted it shall be cut down by reason of the superiority of grant No. 22,267, now owned by complainant under a subsequent deed from the same vendor, and, as we have held, one binding complainant as well as their vendor or conveyor. The principle of the decision on the facts of the case, and that is the extent to which it is authority, is against complainant's contention.

The only claim of defendants is, that they shall have all the land conveyed and actually included in the boundaries referred to in the conveyance or reservation to them. The argument that the conveyance by reference to the grant, only conveys the grant or title in the grant as against an adverse claim of the vendor or persons holding under him by subsequent conveyance, is one not supported by any authority which we have seen, and in the language of one of the learned counsel for complainant, in reference to

another aspect of the case, "too *tenuous*" to be entertained or approved by a court administering practical legal justice. A few additional considerations serve to strengthen the theory of this opinion. The holder of two bodies of land, by different conveyances which interlap, the one title superior in the hands of a third party, has merged the conflict into a single title in himself. It could never be assumed that when he became owner of both titles, he was still keeping up the adversary titles as between his own tracts of land, and one title was being held adverse to the other. This would be absurd. Suppose he had bought the adverse and stronger title, in order to perfect his right, it would be clearly his purpose to extinguish the conflict.

Several analagous cases might be cited in support of the conclusion we have reached on this aspect of the case. It cannot be denied that the land excepted and reserved in the deed to the coal company, and included in the boundaries of grant 22,273, has, by its terms, been conveyed to the vendors of respondent. It is settled by numerous cases in our books that if a party stand by and encourage a sale of his own land, as by witnessing a deed conveying it, or having boundaries including it, with knowledge of the contents of the deed, he is afterwards estopped as against the conveyee in that deed, and all persons claiming under him, to assert even an otherwise valid, legal and superior title in himself. Our cases require in addition that he must speak out and forbid the sale. See Meigs' Dig., (Milliken), vol. 2, sec. 1349, pages

1755-6; much more shall a party who actually makes such a deed, and equally so as to the party accepting such a deed, in which the land is reserved to parties therein specified. The result is, that by the conveyance referred to the complainant, the parties being in fact the sole stockholders in that company, and practically conveying and reserving to and from themselves in this case, the parties to that deed are estopped to assert title as against its terms, and a purchaser under the reservees, will take a good title, as against a subsequent conveyance by one of the same parties to the acceptor of such a deed.

We need not discuss, in the view we have taken of this case, the effect of a quit-claim deed, as it is called, or one with special warranty, in putting the holder of it at his own risk as to title, except as against the covenanter and persons claiming under him, as in the case of *Lowry* v. *Brown*, 1 Cold., 456.

Such a deed only raises, by that case, as well as the other cases in our books, a presumption, or rather furnishes the basis of inference of fact, that the vendee has possible knowledge of a superior title, and puts such party on inquiry as to the validity of the title thus acquired. But this fact may always be explained and met by other facts, and in this case, if it were necessary, the facts would probably sufficiently meet the inference. The parties had all mutually claimed these lands as against each other, and therefore may well have been satisfied to get each other's title without more than a special warranty as against each other. Besides, on the theory we have

given, of which we can have no doubt, there was no adverse title after the deed containing the reservation, all the claimants joining in the deed, and conveying to the coal company, and this company accepting the deed with the reservations in it, estopped all these parties from asserting any adverse title in themselves, and so there was no adverse title, and certainly no notice of any of record in this case that could affect the present defendants, the deed from Bulkley and wife not appearing to have been legally registered by any thing in this record till after the commencement of this suit, in 1881. There is, it is true, a recital in the proceedings for its amendment as to the *feme covert* in New York, that it had been registered in Anderson county in Book X, giving the pages, but we need not argue that this does not affect defendants, who were not parties to that proceeding. The conclusion reached renders it unnecessary to discuss the agreement rfeerred to as Exhibit A, as we think it could have no effect in changing the result. The parties have practically construed it in the deed made, and all the testimony serves to show that these defendants have purchased innocently, with no notice of any adverse valid title, and so are entitled to the land included in the interlap between grants Nos. 22,267 and 22,373.

We may as well say here that the deed from Bulkley and wife, even if registered on a defective acknowledgment of the wife, in that form would be notice to no one, she alone conveying in that deed, the husband joining for conformity, but giving no warranty.

Coal Creek Mining Company *v.* Heck.

The deed of the married woman only took effect as against intervening purchasers, when it was properly acknowledged and registered; it could not relate by the amendment so as to affect them: 3 Cold., 505; 3 Head, 486.

The next question to be decided is, as to that part of the land in dispute, covered by what is known as the George S. Rich grant or tract. It is not denied that grant No. 22,267 is the older and superior title, and that there is an interlap between the lines of the two grants. Respondents assert title, under statute of limitations, under a possession commenced probably as far back as 1854, and continuous from that on to commencement of the suit, by one Sarah Graham and subsequent tenants. It is urged by complainants that this possession is not effective, because in fact she only enclosed a few acres of the land, and erected a house on the same, and it is sought to confine the effect of this holding to this enclosure. The testimony on this question is substantially as follows: Henry Wiley is asked—"State whether McEwen and Wiley ever had possession of the George S. Rich tract? If so, when did it begin, how long did it continue, and describe the possession? He answers—"*We* did put Mrs. Graham on that tract about 1854. She built a house, and cleared and fenced a field. The house, as I recollect, stood just outside of the line of the Julian F. Scott survey. The field was inside of the Julian Scott survey. Both the house and the field were inside the 1,500-acre tract. She lived there and cultivated the field six or seven

33—VOL. 15.

years.    When she left I rented the field to Disney, and he cultivated that field every year until about two years ago, when Henry Waterdorff leased it, and he lives there now."

On cross-examination he is asked : " You state in your direct examination, referring to the above question, that you leased to Sarah Graham.    How many acres did she occupy?"    He says:  " She was put there with liberty to cultivate just so much and so little as she pleased within the George S. Rich survey. I think she only enclosed some two or three acres." Other witnesses prove that Mrs. Graham and her son, who lived with her, claimed to hold under Wiley, and not for themselves.    The meaning of this is, that the witness swears, in answer to the question whether McEwen and himself ever had possession of this land, that they had, and it was by putting Mr. Graham in possession about 1854.    On cross-examination, when asked, " how many acres did she occupy?" he says, "she was at liberty to cultivate just so much or so little, as she pleased, within the George S. Rich tract, and she only enclosed about two acres;" that is, she was put into possession of the tract, and thus we were in possession, and being so in possession, she only enclosed and cultivated the small amount stated, but was at liberty to cultivate as much as she chose.

From the case of *Napier* v. *Simpson,* 1 Tenn. R., 453, down to the present time, it has been uniformly held, " that the possession of land, so as to produce the bar, must be an actual possession of some part in dispute."    All our cases go on the idea that where

there is an interference between titles, if one of the
adverse claimants is in possession of land within the
boundaries of his deed or grant, but not on any part
of the interlap, the statute does not begin to run against
him.    But the moment he occupies the land included
in the other's grant, and holds possession, either by
himself or another, the statute commences to run :
*Talbot* v. *McGavock,* 1 Yer., 262; *Stewart* v. *Hains,*
9 Hum., 715; 3 Head, 304; 2 Sneed, 199.

The case of *McClung* v. *Ross,* 5 Wh., 583, Cart.
Ed., is cited to support the contention that this pos-
session only extended to the enclosure made by Mrs.
Graham.    In that case it appeared "that Minott had
a contract for the sale and purchase of part of the
tract of 5,000 acres sold by Donelson to Ross, and
his contract with McClung was a sale of McClung's
part of the same land, on condition that he would
hold the whole tract for McClung and Hackett.    The
court say: "He does not allege that Hackett put
him in possession of more land than was sold to
him, nor does it appear that McClung put him in
possession of any land further than the virtual pos-
session which was to be implied from the agreement
which has been stated.    The possession of Minott
was an actual possession of part of the land under
a purchase.    It was *his* own possession, and not the
possession of Hackett and McClung.    His agreement
to hold the residue for Hackett and McClung, never
having been followed by actual occupation of any
part of that residue, could not be construed into such
a possession as to affect Ross' title.    This is all very

well. But here we have no case of a purchase or holding for himself as to part, with an agreement not carried into effect, to hold balance for another; on the contrary, we have the simple case of a party claiming title to a large tract of land, putting another in possession of the land, and in actual occupation of a disputed part of it, and this party holding under him for the period sufficient to complete the bar of the statute. The fact that only a small quantity was cultivated does not change the result. There was no limitation on the possession given, and the owner of 22,267 could have brought suit against this occupant at any time, or if he had ousted the tenant, and occupied the vacant place by himself or tenant, it would at once have broken the possession of the holder of the other grant, and if continued for seven years, would have given title to the extent of his boundary. We think the possession thus proven vests title to the whole tract into which Sarah Graham was put in possession, regardless of how much was actually enclosed.

We would probably reach the same result upon other considerations. But we find it would make this opinion too cumbersome were we to undertake to discuss all the questions presented in the able arguments of counsel in this case. We, therefore, content ourselves with the settlement of the questions discussed as conclusive of the result, and which we feel satisfied gives the legal rights of the parties to this controversy.

The decree of the chancellor is affirmed, report of Referees disapproved, with costs.